No. 24-30651

# In the United States Court of Appeals for the Fifth Circuit

ASTRAZENECA PHARMACEUTICALS, L.P.,

*Plaintiff-Appellant,*

*v.*

LIZ MURRILL, in her official capacity as
Attorney General of the State of Louisiana,

*Defendant-Appellee,*

*and*

LOUISIANA PRIMARY CARE ASSOCIATION,

*Intervenor-Defendant-Appellee.*

On Appeal from the U.S. District Court
for the Western District of Louisiana
No. 6:23-cv-1042 (Hon. Robert R. Summerhays)

### APPELLANT'S OPENING BRIEF

Allon Kedem
Jeffrey L. Handwerker
Stephen K. Wirth
ARNOLD & PORTER
 KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for AstraZeneca
Pharmaceuticals L.P.*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this appeal. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant AstraZeneca Pharmaceuticals L.P.** AstraZeneca Pharmaceuticals L.P. is a limited partnership and an indirectly wholly owned subsidiary of AstraZeneca plc, which is a public company organized under the laws of England and Wales and is publicly traded. No other publicly held company owns 10% or more of the voting interest in AstraZeneca Pharmaceuticals L.P. The following attorneys have represented AstraZeneca Pharmaceuticals L.P. in this case:

> Jeffrey Handwerker, Allon Kedem, Stephen Wirth, and Samuel Ferenc of Arnold & Porter Kaye Scholer LLP; Brent Barriere and Kaja Elmer of Fishman Haygood; E. Paige Sensenbrenner and Diana Surprenant of Adams & Reese.

Dated: January 9, 2025

*/s/ Allon Kedem*
Allon Kedem

*Counsel for Appellant AstraZeneca Pharmaceuticals L.P.*

i

## STATEMENT REGARDING ORAL ARGUMENT

Due to the importance and complexity of the issues presented, Appellant AstraZeneca Pharmaceuticals L.P. respectfully requests oral argument in this matter.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

STATEMENT REGARDING ORAL ARGUMENT ........................................ ii

TABLE OF CONTENTS ................................................................... iii

TABLE OF AUTHORITIES ................................................................ v

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES .......................................................... 1

INTRODUCTION ........................................................................... 2

STATEMENT OF THE CASE ............................................................. 4

    A.    The Federal 340B Program and Contract Pharmacy Abuse ........ 4

    B.    Louisiana Enacts Legislation Mandating 340B Discounts for Unlimited Contract Pharmacy Sales ............................................. 13

    C.    Procedural History ........................................................... 15

SUMMARY OF ARGUMENT ............................................................. 17

STANDARD OF REVIEW ................................................................. 20

ARGUMENT ............................................................................... 21

I.    Act 358 Is Preempted by Federal Law ......................................... 21

    A.    No Presumption against Preemption Applies ............................ 21

    B.    Act 358 Regulates Pricing .................................................. 25

    C.    Act 358 Is Preempted by Section 340B .................................. 30

II.    Act 358 Violates the Contracts Clause ......................................... 35

    A.    Act 358 Impairs AstraZeneca's PPA ...................................... 38

B.    Defendants Have Not Demonstrated that Act 358 Is Reasonably Tailored to Serve a Significant and Legitimate Public Purpose.......................................................................44

CONCLUSION......................................................................................48

CERTIFICATE OF SERVICE..........................................................49

CERTIFICATE OF COMPLIANCE................................................50

# TABLE OF AUTHORITIES

**Constitutional Provisions**                                          Page(s)

U.S. Constitution, Article VI, Clause 2 ...............................................21

**Cases**

*Aldridge v. Miss. Dep't of Corr.,*
  990 F.3d 868 (5th Cir. 2021) ...............................................................21

*Allied Structural Steel Co. v. Spannaus,*
  438 U.S. 234 (1978) ...........................................................36, 41, 42, 43

*Apartment Ass'n of Los Angeles, Cnty., Inc. v. City of Los Angeles,*
  10 F.4th 905 (9th Cir. 2021) ...............................................................46

*Assn. of Equip. Mfrs. v. Burgum,*
  932 F.3d 727 (8th Cir. 2019) ...............................................................46

*Astra USA, Inc. v. Santa Clara Cnty.,*
  563 U.S. 110 (2011) ...............................................................................5

*AstraZeneca Pharms. LP v. Becerra,*
  543 F. Supp. 3d 47 (D. Del. 2021) ......................................................12

*AstraZeneca Pharms. LP v. Becerra,*
  No. 1:21-cv-27, 2022 WL 484587 (D. Del. Feb. 16, 2022) ...................12

*Barosse v. Huntington Ingalls, Inc.,*
  70 F.4th 315 (5th Cir. 2023) ...............................................................20

*Biotechnology Industry Organization v. District of Columbia,*
  2006 WL 3382103 (Oct. 30, 2006).......................................................24

*Biotechnology Industry Organization v. District of Columbia,*
  496 F.3d 1362 (Fed. Cir. 2007) ...........................................................24

*Buckman Co. v. Plfs.' Legal Comm.,*
  531 U.S. 341 (2001).........................................................18, 22, 30, 32, 33

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000)............................................................................30, 33

*Eastman Kodak Co. v. Image Technical Servs., Inc.,*
  504 U.S. 451 (1992)..................................................................................45

*Felder v. Casey,*
  487 U.S. 131 (1988)..................................................................................21

*Hernandez v. Mesa,*
  589 U.S. 93 (2020)....................................................................................35

*Janvey v. Democratic Senatorial Campaign Comm., Inc.,*
  712 F.3d 185 (5th Cir. 2013)....................................................................34

*Jones v. Bd. of Supervisors of Univ. of La. Sys.,*
  58 F. Supp. 3d 670 (W.D. La. 2014) ........................................................37

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
  480 U.S. 470 (1987)..................................................................................47

*Lofton v. McNeil Consumer & Specialty Pharms.,*
  672 F.3d 372 (5th Cir. 2012)....................................................................22

*Norris v. Hearst Trust,*
  500 F.3d 454 (5th Cir. 2007)......................................................................8

*Novartis Pharms. Corp. v. Johnson,*
  102 F.4th 452 (D.C. Cir. 2024) ...................................3, 9, 13, 27, 28, 31, 38, 43

*Pharm. Care Mgmt. Ass'n v. Wehbi,*
  18 F.4th 956 (8th Cir. 2021) ....................................................................23

*PhRMA v. McClain,*
  95 F.4th 1136 (8th Cir. 2024) ...................................................21, 23, 28, 29

*PhRMA v. Morrisey,*
  No. 2:24-cv-271, 2024 WL 5147643 (S.D.W. Va. Dec. 17, 2024) ...................29

*Powers v. United States,*
  783 F.3d 570 (5th Cir. 2015)....................................................................37

*Sanofi Aventis U.S. LLC v. HHS,*
    58 F.4th 696 (3d Cir. 2023)..............................................3, 6, 12, 31, 35, 38, 43

*Sveen v. Melin,*
    584 U.S. 811 (2018)..............................................................................38, 39

*United Healthcare Ins. Co. v. Davis,*
    602 F.3d 618 (5th Cir. 2010).............................................36, 37, 44, 45

*Wyeth v. Levine,*
    555 U.S. 555 (2009)....................................................................................23

## Statutes

42 U.S.C.
    § 256b.................................................................................................1, 2, 4
    § 256b(a)(1) .................................................................................5, 36, 38
    § 256b(a)(4)(I) .......................................................................................6
    § 256b(a)(4)(A)-(*O*) .............................................................................6

D.C. Code § 28-4553...................................................................................24

La. R.S.
    40:1060.13(A) .......................................................................................26
    40:2882(1) ................................................................................3, 14, 25
    40:2882(2) ..............................................................................................14
    40:2883 ...................................................................................................14
    40:2884(A) ...............................................................................3, 15, 25
    40:2883(A)(1)(a) .................................................................................25
    40:2884(B) ............................................................................................15
    40:2885 ...........................................................................................15, 25
    51:1407(A) ...........................................................................................15
    51:1407(B) ...........................................................................................15
    51:1408(A) ...........................................................................................15
    51:1417...................................................................................................15

## Regulations & Rules

61 Fed. Reg. 43,549 (Aug. 23, 1996) ......................................................7

75 Fed. Reg. 10,272 (Mar. 5, 2010)........................................................7

Fed. R. Civ. P. 56(d) ..............................................................47

La. Admin. Code tit. 46, pt. LIII § 2705(F)(4)..................26

**Legislative Materials**

H.R. Rep. No. 102-384 (1992) ...............................................5

2023 La. Sess. Law Serv. ......................................................13

**Other Authorities**

Adam J. Fein, *Drug Channels Inst., Exclusive: For 2023, Five
    For-Profit Retailers and PBMs Dominate an Evolving 340B
    Contract Pharmacy Market* (Jul. 11, 2023)....................8

HHS-OIG, *Memorandum Report: Contract Pharmacy Arrangements
    in the 340B Program*, OEI-05-13-00431 (Feb. 4, 2014)...............................46

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On September 30, 2024, the district court granted a motion for summary judgment. Appellant timely filed a notice of appeal on October 7, 2024. ROA.1004. This court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires drug manufacturers to enter into contracts with the Secretary of Health and Human Services, in which the manufacturer agrees to offer its products at discounted rates to a defined list of covered entities. Louisiana Act 348 requires any manufacturer participating in the 340B program to make discounts available for drug sales made through an unlimited number of pharmacies, with which a covered entity may choose to contract.

The issues presented are:

1.    Whether Louisiana Act 348 is preempted by Section 340B because it rebalances the benefits and burdens of participating in the federal 340B program.

2.    Whether Louisiana Act 348 violates the Contracts Clause because it imposes new and unjustified obligations on manufacturers that go beyond those the manufacturer agreed to under its contract with the HHS Secretary.

## INTRODUCTION

Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires participating manufacturers to "offer" their products at steeply discounted rates to an enumerated and clearly defined list of covered entities. Access to these 340B discounts is valuable to covered entities—and costly to manufacturers—and Congress carefully limited the circumstances in which such discounts must be made available. A number of manufacturers, including plaintiff AstraZeneca Pharmaceuticals L.P., sued the federal government to establish that Section 340B does not require manufacturers to make discounts available for drug sales at unlimited commercial pharmacies that contract with covered entities (known as "contract pharmacy sales").

Louisiana took the opposite side of that dispute. As an amicus, it argued that manufacturers who "limit[] 340B covered entities to using a single retail community pharmacy" are thereby "flout[ing] their statutory obligation to offer safety-net providers 340B-discounted prices on critical prescription drugs." Br. of Amici Curiae States at 2, *Novartis Pharms. Corp. v. Johnson*, Nos. 21-5299 & 21-5304 (D.C. Cir. May 23, 2022). But multiple federal courts have now ruled that participating manufacturers' obligation to "offer" discounts under the 340B program does not "require[] drug makers to deliver [340B-discounted] drugs to

2

an unlimited number of contract pharmacies." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 461 (D.C. Cir. 2024); *accord Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023).

Having unsuccessfully advocated for requiring manufacturers to provide 340B discounts for unlimited contract pharmacy sales under Section 340B, Louisiana enacted a law aimed at imposing the same obligation under state law. In June 2023, the Legislature enacted the "The Defending Affordable Prescription Drug Costs Act." Referred to as Act 358, the law forbids a manufacturer from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity." La. R.S. 40:2884(A). Since the Act defines a 340B drug as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. 256b," La. R.S. 40:2882(1), the law's purpose and effect is to require participating manufacturers to make 340B discounts available for unlimited contract pharmacy sales.

Act 358 is unconstitutional, on two independent grounds. First, the Act conflicts with, and is therefore preempted by, Section 340B. The new obligations imposed by the Act apply to manufacturers if, but only if, they participate in the

federal 340B program. But that violates preemption principles under the Supremacy Clause: No State, including Louisiana, may engraft costly obligations under state law onto an existing federal benefits program. By extending 340B-discounted pricing to unlimited contract pharmacy sales—discounts not required by Section 340B itself—Act 358 drastically increases manufacturers' costs of participating in the 340B program, undermining Congress's careful balance of statutory objectives.

Second, Act 358 violates the Contracts Clause, because it imposes new obligations that go well beyond what AstraZeneca agreed to when it contracted with the Secretary of Health and Human Services to participate in the 340B program. Decades after AstraZeneca agreed to undertake a defined set of obligations in return for the benefits of participation, Louisiana has imposed new and unanticipated burdens. The Act thus impairs AstraZeneca's preexisting contractual rights, and it does so without adequate justification—since 340B discounts for contract pharmacy sales are not passed on to patients.

## STATEMENT OF THE CASE

### A.    The Federal 340B Program and Contract Pharmacy Abuse

**1.**    Congress enacted Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, known as the 340B Program, "to enable [covered entities] to obtain lower prices on the drugs that they provide to their

4

patients." H.R. Rep. No. 102-384, pt. 2, at 7 (1992). A related federal program, Medicaid, had long required manufacturers to provide rebates on a drug's "best price" (*i.e.*, the lowest price offered to an eligible purchaser). But in doing so, it had created an unintended "disincentive" for manufacturers to offer discounts to needy purchasers. *Id.* at 9-10. Section 340B remedied that disincentive, by "exclud[ing]" discounts to such purchasers from the best-price formula. *Id.* at 11.

In addition, Congress took steps to provide discounts directly to needy healthcare providers. Section 340B "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011). As a condition of receiving reimbursement for its drugs under Medicaid and Medicare Part B, a manufacturer must enter into a pharmaceutical pricing agreement (PPA) with the Secretary of the U.S. Department of Health and Human Services (HHS). 42 U.S.C. § 256b(a)(1). Under its PPA, the manufacturer must "offer each covered entity covered outpatient drugs for purchase" at prices that are substantially discounted under a statutory formula. *Id.*

Congress intended for the 340B program to benefit underserved communities by allowing covered entities to pass on the below-market prices required by Section 340B, called "340B prices," to the "low-income and rural persons" for whom they often care. *Sanofi-Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). That is how the program worked originally. But over time, covered entities realized that if they *didn't* pass on the full 340B discount, they could use the Program to generate arbitrage "revenue." *Id.* As the Third Circuit has explained, "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Id.* The pursuit of these arbitrage profits—and new schemes for generating them in ever-larger amounts—have transformed the 340B program into something that would be unrecognizable to the Congress that enacted it.

2.     Congress limited the reach of the 340B program by delineating fifteen specific categories of covered entities to whom manufacturers must offer 340B prices. 42 U.S.C. § 256b(a)(4)(A)-(*O*). Section 340B does not require manufacturers to make 340B discounts available to any entity not specifically enumerated. In the years since Congress enacted Section 340B, however, the Health Resources and Services Administration (HRSA), the sub-agency that administers the 340B program, has issued two non-binding "guidance"

documents purporting to authorize covered entities to enter into agreements with pharmacies to dispense outpatient drugs under Section 340B. These so-called "contract pharmacy" arrangements have fundamentally transformed the 340B program.

In 1996, HRSA issued guidance under which "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could enter into an agreement with a *single* outside pharmacy of its choice ("only one site") to provide such services for 340B drugs. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance). Then, in 2010, HRSA released new guidance permitting covered entities to "use multiple pharmacy arrangements"—that is, an *unlimited* number of contract pharmacies, without any geographic limits—"as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition." 75 Fed. Reg. 10,272, 10,273 (2010 Guidance). The 2010 Guidance thus purported to authorize a covered entity to enter into an unlimited number of contract pharmacy arrangements anywhere in the United States.

The 2010 Guidance led to an explosion in contract pharmacies accessing discounts for 340B drugs, enabling them to reap outsized profit margins by reselling these discounted drugs at full price to insured patients. The number

of contract pharmacies correspondingly ballooned, from approximately 1,300 in 2010 to more than 33,000 today. Adam J. Fein, *Drug Channels Inst., Exclusive: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market* (Jul. 11, 2023).[1] These contract pharmacies now hold more than 194,000 individual contracts with covered entities. *Id.*

Although contract pharmacy sales occur in the name of the covered entity, that is largely a matter of semantics. For instance, covered entities do not maintain title to 340B drugs, which are held by contract pharmacies just like any other drugs; and such pharmacies are typically independent contractors, *not* agents of covered entities, with respect to the acquisition and sale of 340B drugs. *See, e.g.*, Opp'n to Mot. Summ. J. Ex. A, § 3.3.5, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-cv-1603 (D.D.C. Nov. 29, 2024), ECF No. 24-2 (contract showing title passes from covered entity to contract pharmacy); *id.* § 8.10 (stating contract pharmacies are not agents of the covered entity).[2] Instead, the contract pharmacy mechanism is just a way to generate additional 340B discounts for transactions that would otherwise occur in precisely the same way.

---

[1] https://www.drugchannels.net/2023/07/exclusive-for-2023-five-for-profit.html.

[2] This Court has held that courts may take judicial notice of "matters of public record," such as public court filings. *See, e.g.*, *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

This fact is made unmistakably clear by the so-called replenishment model that is now used for nearly all contract pharmacy sales. Under this model, eligibility for the 340B discount is not determined until *after* the drug has already been dispensed to the patient and paid for at the commercial price established by the patient's insurance. ROA.170–71. As the D.C. Circuit has explained:

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024); *see* Decl. of Krista M. Pedley ¶¶ 5-9, *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2.

In other words, a contract pharmacy sale usually just involves a normal drug sale that is initially conducted at full commercial prices (paid by a

pharmacy customer or his insurer), followed by an after-the-fact determination of program eligibility and a request by the pharmacy to "replenish" the dispensed drugs at 340B-discounted prices. This means that a 340B discount is applied for the contract pharmacy sale even though the pharmacy has *also* benefitted from the full insurance reimbursement. The result is significant arbitrage revenue, which the contract pharmacy splits with its covered entity and third-party administrator partners. ROA.170–71. A contract pharmacy sale is thus merely a post hoc accounting exercise designed to invoke the statutory discount for a sale that has already occurred.

**3.** In August 2020, AstraZeneca announced to covered entities that, effective October 1, it would revert to the contract pharmacy approach set forth in HRSA's 1996 Guidance. ROA.172. Under this policy, AstraZeneca continues to make its products available at 340B-discounted prices to all covered entities. For covered entities that do not maintain their own on-site dispensing pharmacy, AstraZeneca provides discounts for sales at a single contract pharmacy site for each covered entity. But AstraZeneca no longer allows covered

entities to obtain 340B discounts for sales at an unlimited number of contract pharmacies. ROA.172.

AstraZeneca's policy was and remains fully consistent with the letter and intent of the 340B program—limiting the potential for abuse, while still enabling all covered entities and their patients to continue to access Astra-Zeneca's medicines at 340B prices. Under AstraZeneca's policy, several thousand covered entities that lack an on-site pharmacy have registered a contract pharmacy to which AstraZeneca continues to make 340B discounts available, including approximately 46 covered entities in Louisiana. ROA.172. Astra-Zeneca is committed to working with all covered entities to ensure that every patient can obtain needed medicines at prices they can afford.

In response to AstraZeneca's new contract pharmacy policy and similar policies adopted by other manufacturers, HHS issued an Advisory Opinion on December 30, 2020, claiming that the 340B statute requires manufacturers to deliver 340B-discounted drugs to unlimited contract pharmacies. AstraZeneca challenged the Advisory Opinion in the U.S. District Court for the District of Delaware. The court found the Advisory Opinion unlawful, concluding that Section 340B "says nothing about the permissible role (if any) of contract pharmacies," and that, in light of this "total omission," the Advisory Opinion's

attempt to impose an obligation on AstraZeneca to make discounts available for unlimited contract pharmacy sales was "legally flawed." *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 59 (D. Del. 2021). HHS withdrew the Advisory Opinion following the Delaware court's ruling.

In a second ruling, the Delaware court addressed AstraZeneca's challenge to a "violation letter" issued by HRSA, which had adopted the same position as the Advisory Opinion. The court again rejected the agency's view that Section 340B obligates drug manufacturers to make 340B discounts available for unlimited contract pharmacy sales. *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-27, 2022 WL 484587, at *5–6 (D. Del. Feb. 16, 2022).

The U.S. Court of Appeals for the Third Circuit affirmed those rulings, holding that the Advisory Opinion and violation letter were "unlawful" and "enjoin[ing] HHS from enforcing against" AstraZeneca the agency's "reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 706. The court also held that AstraZeneca's "restrictions on delivery to contract pharmacies do not violate Section 340B." *Id.*

The government neither sought en banc review of the Third Circuit's decision nor filed a petition for certiorari in the U.S. Supreme Court. On May

5, 2023, the Delaware district court issued a final judgment, to which the government stipulated, declaring that the Advisory Opinion and Violation Letter were unlawful and that AstraZeneca's policy limiting the use of contract pharmacies "does not violate Section 340B." Final Judgment at 1, *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-27 (D. Del. May 5, 2023), ECF No. 123. The court enjoined the government from enforcing against AstraZeneca the agency's reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies. *Id.*

The D.C. Circuit subsequently joined in "reject[ing] [the] position that section 340B prohibits drug manufacturers from imposing any conditions on the distribution of discounted drugs to covered entities." *Novartis Pharms.*, 102 F.4th at 459.

## B.    Louisiana Enacts Legislation Mandating 340B Discounts for Unlimited Contract Pharmacy Sales

On June 12, 2023, one month after the final judgment was issued in AstraZeneca's action, Governor John Bel Edwards signed the "Defending Affordable Prescription Drug Costs Act." 2023 La. Sess. Law Serv. Act 358 (adding Sections 2881-2886 to Title 40 of the Louisiana Revised Statutes). Consistent with its name, the operation and intent of Act 358 is to regulate drug

prices, by compelling pharmaceutical manufacturers to make 340B discounts available for sales at an unlimited number of contract pharmacies.

Act 358 expressly identifies the federal 340B Program as its regulatory object. Among other things, the Act defines key terms such as "340B drug" and "340B entity" by reference to Section 340B. *See* La. R.S. 40:2882(1), (2). Most significantly, a 340B drug is defined as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. 256b." La. R.S. 40:2882(1).

Act 358 then imposes two sets of substantive prohibitions. First, it generally bars health insurance issuers, pharmacy benefit managers, and other third-party payors from reducing reimbursements and imposing certain conditions on 340B entities based on their 340B status. La. R.S. 40:2883. Second, and as most relevant here, the Act imposes obligations on manufacturers who participate in the 340B program:

> A. A manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by [HHS].

> B. A manufacturer or distributor shall not interfere with a pharmacy contracted with a 340B entity.

14

La. R.S. 40:2884(A)–(B).

Any violation of Act 358 is deemed a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 *et seq*. *See* La. R.S. 40:2885. Commission of a prohibited act "subjects the violator to any and all actions, including investigative demands, remedies, and penalties" under that law. *Id.* The Attorney General, and district attorneys under his supervision, may seek "a civil penalty" for violations of the statute, La. R.S. 51:1407(B), 51:1417, and may bring actions to enjoin unlawful activities, La. R.S. 51:1407(A). In addition, courts can issue orders against any party to compensate any aggrieved person for property unlawfully acquired. La. R.S. 51:1408(A). Such orders may include restitution, revocation of licenses or other authority to conduct business, appointment of a receiver—even suspension or termination of the corporation's right to do business in Louisiana. *Id.*

## C.    Procedural History

On August 4, 2023, AstraZeneca filed this suit alleging that Act 358 is unconstitutional on multiple grounds. As relevant here, AstraZeneca argued that the Act is preempted by Section 340B and violates the Contracts Clause because it impairs AstraZeneca's PPA with HHS. On November 7, an association representing covered entities based in Louisiana, the Louisiana

Primary Care Association, intervened to defend the Act. The parties briefed cross-motions for summary judgment.

On September 30, 2024, the district court issued a memorandum granting judgment for defendants and against AstraZeneca, as well as for defendants in two related cases, *Pharmaceutical Research and Manufacturers of America v. Murrill*, No. 23-cv-997, and *AbbVie, Inc. v. Murrill*, No. 23-cv-1307. On AstraZeneca's preemption claim, the court held that "Act 358's provisions addressing contract pharmacies do not create an unacceptable obstacle to the accomplishment and execution of Congress' objectives reflected in Section 340B because Section 340B does [not] address contract pharmacies." ROA.988 (cleaned up). The Court also held that the Act "arguably advances Congress' objectives with respect to the Section 340B program" because it allows covered entities to "increase their revenues from insured patients who use [contract] pharmacies," and because "[m]ultiple contract pharmacies also arguably provide wider coverage for patients of covered entities." ROA.988 (emphasis omitted).

The district court further held that Act 358 does not violate the Contracts Clause. ROA.993-96. The court determined that the Act does not interfere with AstraZeneca's PPA because it does not "change what prices

16

drug companies may charge covered entities," since it "only affects the *delivery* or *acquisition* of Section 340B drugs." ROA.994. In the court's view, AstraZeneca could not "point to any way in which the Act expands or contradicts its PPA because, like the statute, the PPA is silent as to delivery to or acquisition of Section 340B drugs to contract pharmacies." ROA.994. The court also stated that, even if Act 358 impaired the PPA, Louisiana would "have a legitimate purpose for doing so." ROA.995.

## SUMMARY OF ARGUMENT

**I.**     Act 358 is preempted by Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b.

***First***, no presumption against preemption applies here because Act 358 directly targets federal law: It regulates the relationship between 340B covered entities and manufacturers who choose to participate in the 340B program. Indeed, the Act has no operation or effect *other than* to regulate transactions within this uniquely federal relationship.

***Second***, Act 358 regulates drug pricing—an area generally outside of state control—by forcing manufacturers to make their drugs available at heavily discounted 340B prices for unlimited contract pharmacy sales. Pricing is the *only* thing that distinguishes a sale that complies with the Act from a

sale that violates the law. Below, the district court attempted to characterize Act 358 as a regulation of drug acquisition and distribution. But the law says nothing about any genuine aspect of how a drug is distributed, such as its labeling, shipping, or storage. And regardless, requiring delivery of 340B-discounted drugs is equivalent to requiring 340B pricing for drugs. Indeed, under the replenishment model used by covered entities, the relevant drugs have *already* been distributed at the time of the regulated transaction; the only question is whether the replenishment sale will take place at the 340B price (no violation of Act 358), or instead at commercial prices (violation).

***Third***, by extending 340B-discounted pricing to unlimited contract pharmacy sales, Act 358 drastically increases a manufacturer's costs of participating in the federal 340B program. Defendants focus on how those sums, which they euphemistically describe as 340B "revenue" or "savings," end up benefitting covered entities. But however described, these costs come directly out of the pockets of drug manufacturers, making their participation in the 340B program correspondingly more burdensome. Act 348 thus "exert[s] an extraneous pull on the scheme established by Congress," thereby "skew[ing]" the program's "delicate balance of statutory objectives." *Buckman Co. v. Plfs.' Legal Comm.*, 531 U.S. 341, 348, 353 (2001).

**II.**    AstraZeneca has properly stated a claim under the Contracts Clause. Act 358 substantially impairs AstraZeneca's pharmaceutical pricing agreement (PPA) with the federal government, by imposing costly new state-law obligations as a consequence of AstraZeneca's participation in the federal 340B program. The Act requires AstraZeneca to make 340B discounts available for unlimited contract pharmacy sales, even though that obligation is not reflected in the PPA that it signed. Decades after agreeing to participate in the federal 340B program, AstraZeneca could not have anticipated—and did not anticipate—that a State would later impose an additional obligation to make 340B discounts available for a broad new category of transactions.

The district court held that AstraZeneca's PPA was not impaired because the Act does not change which *entities* qualify for 340B discounts; but it undeniably expands the category of *sales* that qualify. And the court's reasoning that Act 358 does not affect AstraZeneca's contractual rights because it regulates delivery rather than pricing is both wrong (for the reasons explained above) and also irrelevant: Even if the Act is described as requiring "delivery" of 340B drugs to unlimited contract pharmacies, it still imposes *under Louisiana law* a costly new obligation that did not previously exist *under the PPA*.

19

Act 358 is not reasonably necessary to advance the State's asserted interest in protecting its citizens' access to prescription drugs. In fact, the law does not promote patient access: Independent studies from governmental sources, which AstraZeneca cited in its complaint, show that 340B discounts are usually *not* passed on to contract pharmacy customers, who continue to pay full price. Defendants offered no evidence to the contrary.

The district court nevertheless held that Act 358 was reasonably tailored, on the ground that "[t]he state could credibly argue" it promotes greater patient access. ROA.995. But such speculation is plainly insufficient, particularly in the face of actual evidence to the contrary from AstraZeneca. Indeed, these sorts of factual disputes are why Contracts Clause claims are rarely—if ever—decided without a fully developed evidentiary record. And while the State requests deference for its "legislative judgment," ROA.342 (citation omitted), such deference is applied to legislative findings; here, there were none.

## STANDARD OF REVIEW

This court reviews de novo a district court's grant of summary judgment, including on questions of preemption. *Barosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 319–20 (5th Cir. 2023).

20

## ARGUMENT

### I.    Act 358 Is Preempted by Federal Law

The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "The doctrine of federal preemption that arises out of the Supremacy Clause requires that 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Aldridge v. Miss. Dep't of Corr.*, 990 F.3d 868, 874 (5th Cir. 2021) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)). Act 358 directly interferes with—and is thus preempted by—the federal 340B program.

### A.    No Presumption against Preemption Applies

The district court adopted a presumption against preemption on the ground that Act 358 operates in "an area traditionally left to state regulation." ROA.981 (quoting *PhRMA v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024)). But for two independent reasons, no such presumption applies here.

***First***, Act 358 exclusively regulates transactions involving 340B drugs that take place between manufacturers participating in the federal 340B program, 340B covered entities, and the pharmacies with which they contract.

The Act thus directly targets, and indeed is entirely parasitic on, federal law; if Section 340B were to be repealed, Act 358 would cease to have any effect. The State has identified no authority for applying the presumption against preemption to a state law that *solely* regulates entities participating in a federal program—and targets them *because of* their federal participation.

Indeed, all authority is to the contrary. As the Supreme Court has explained, no presumption against preemption applies when a State attempts to regulate something "inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plfs.' Legal Comm.*, 531 U.S. 341, 347 (2001). Where "federal law dictates which information [a] manufacturer is obliged to disclose," for instance, "[s]tate laws that depend on such disclosures are not entitled to a presumption against preemption." *Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372, 378-79 (5th Cir. 2012). The same dynamic applies here: AstraZeneca's obligations towards 340B covered entities originate from Section 340B; are governed by Section 340B; and will terminate when AstraZeneca no longer participates in the 340B program. "As a result," 340B sales "are 'uniquely federal' and thus beyond the states' traditional police power." *Id.* at 379 (quoting *Buckman*, 531 U.S. at 347).

Nor can a presumption against preemption be justified on the ground that "the practice of pharmacy is an area traditionally left to state regulation." *McClain*, 95 F.4th at 1143 (quoting *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021)). To be sure, state law has historically provided a "complementary form of drug regulation," including a "layer of consumer protection that complements [federal] regulation." *Wyeth v. Levine*, 555 U.S. 555, 578-79 (2009). But those generally applicable state laws regulate the sale and distribution of *all* drugs, not just drugs sold within a federal program. Act 358, by contrast, is anything but generally applicable: It applies if—but *only* if—a manufacturer signs a PPA with the Secretary of HHS agreeing to abide by the 340B program's requirements, and the Act attempts to dictate the treatment of 340B drugs solely within that federal program.

**Second**, a presumption against preemption is also inapplicable here because there is no "historic presence of state law" in regulating drug *pricing*— much less in regulating the price of 340B drugs in particular. *Id.* at 565 n.3. As explained below in Section I.B, Act 358 regulates the price at which drugs must be offered in 340B contract pharmacy sales. It is thus qualitatively different from traditional state regulations designed to promote consumer health and safety. Indeed, to the extent Act 358 could affect health or safety at all,

Louisiana itself has acknowledged that it would do so only *incidentally*, as an "attendant effect" of keeping drug prices low. ROA.327.

As courts have held, however, drug pricing is *not* an area of traditional state regulation. In *Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007) (*BIO*), the District of Columbia enacted a statute prohibiting the sale of certain drugs at "an excessive price." *Id.* at 1371 (quoting D.C. Code § 28-4553). When an organization of drug manufacturers challenged the law on preemption grounds, the District argued that the reviewing court should apply a "presumption that Congress has not intended to supplant [a]  state law" that "addresses an area of traditional state regulation," particularly since "the state law at issue seeks to preserve the health and welfare of its citizens." Br. for Defs., *BIO*, 2006 WL 3382103 (Oct. 30, 2006).

The Federal Circuit disagreed. The court explained that the District's law was "targeted at the [federal] patent right"—that is, at federal laws setting "the proper balance between innovators' profit and consumer access to medication"—and thus the law fell within an area of traditional *federal* regulation, not state regulation. *BIO*, 496 F.3d at 1374. The same is true here: Act 358 is "targeted at" the ability of drug manufacturers to charge market

24

prices for 340B drug sales to contract pharmacies. Under those circumstances, no presumption against preemption applies.

## B.     Act 358 Regulates Pricing

As its name indicates, the "Defending Affordable Prescription Drug Costs Act" governs the prices at which manufacturers must make their drugs available for contract pharmacy sales. On its face, the Act 358 defines the drugs that it regulates *solely* in terms of their price: A "340B drug" is a drug that has been subject to "any offer for reduced prices by a manufacturer pursuant to" Section 340B. La. R.S. 40:2882(1). Act 358 then requires manufacturers to make "340B drug[s]"—*i.e.*, drugs at "reduced prices"—available to contract pharmacies. La. R.S. 40:2884(A). A manufacturer's attempt to use a different (market-based) price for contract pharmacy sales constitutes a statutory "violation" that is subject to a range of harsh "penalties." La. R.S. 40:2885. Act 358 thus regulates pricing on its face—and, insofar as manufacturers are affected, it *only* regulates pricing.[3]

---

[3] Act 358 also regulates pricing by health insurance issuers, pharmacy benefit managers, and other third-party payors: It forbids them from reducing "reimbursement to a 340B entity" based on the 340B status of the drugs sold. La. R.S. 40:2883(A)(1)(a).

The district court below asserted, without any meaningful analysis, that "Act 358 only affects the *delivery* or *acquisition* of Section 340B drugs." ROA.994. But nothing in Act 358 regulates any aspect of drug distribution aside from delivery at a particular price. To be sure, as Intervenor noted below, Louisiana *does* have several other laws that speak in generally applicable terms about who is authorized to deliver, sell, and possess prescription drugs and that regulate various aspects of drug distribution, inventory, and storage. ROA.377. But the contrast with these other laws—which *actually* regulate drug distribution and delivery—only shows how different Act 358 is.

For instance, the Louisiana Drug and Device Distributors Act, La. R.S. 37:3461 *et seq.*, requires all wholesale drug distributors to be licensed according to statutory criteria and establishes a board to regulate the wholesale distribution of all prescription drugs in the state. Likewise, Section 1060.13 of Title 40 prohibits the sale, delivery, or possession of restricted drugs "except upon the order or prescription of a physician or licensed health care practitioner." La. R.S. 40:1060.13(A). These laws regulate genuine aspects of drug distribution: who is authorized to deliver, sell, and possess them. They are violated when drugs are distributed in a particular manner, such as without "possession of a valid [controlled dangerous substance] license." La. Admin.

Code tit. 46, pt. LIII § 2705(F)(4). What leads to a violation of Act 358, by con-trast, is conducting a transaction at the wrong *price*. Indeed, pricing is the *only* thing that distinguishes a sale that complies with Act 358 from a sale that violates the law.

Even if Act 358 could be viewed as addressing acquisition and delivery, moreover, that still would not change its character as a price regulation. There is no meaningful difference between a statute requiring the sale of goods to identified buyers at a specified price ("You must sell me a car for $1"), and a statute mandating delivery of the same goods at that same price to the same buyers ("You may not deny me delivery of a $1-priced car."). Act 358's sole effect is to require manufactures to make 340B discounts available for unlim-ited contract pharmacy sales.

The replenishment model used by contract pharmacies makes this espe-cially clear. Under that model, contract pharmacies "fill prescriptions from in-ventories that intermingle discounted and non-discounted drugs." *Novartis Pharms.*, 102 F.4th at 457. The pharmacy will dispense these drugs to any pa-tient, whether 340B-eligible or not. "Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were

27

eligible for the discount." *Id.* After an eligibility determination has been made (often by a third-party administrator), "the pharmacy places an order" from the manufacturer at "the discounted [340B] price," which it uses to "replenish" its inventory (where 340B and non-340B drugs are again intermingled). *Id.*

Thus, under the replenishment model, the actual distribution (*i.e.*, movement) of 340B drugs is no different from that of non-340B drugs; and the acquisition of those drugs differs only in terms of their prices. Indeed, as an Intervenor acknowledged below, the replenishment model turns 340B contract pharmacy sales into a mere "accounting mechanism," in which discounts are applied in an after-the-fact financial "reconciliation." ROA.1099.

In ruling that Act 358 regulates drug distribution, the district court relied on the Eighth Circuit's decision in *PhRMA v. McClain*. ROA.973, 978, 981, 986. But that court simply assumed without discussion that the challenged state laws regulate delivery, not price. *See McClain*, 95 F.4th at 1139, 1142–43.[4] The Eighth Circuit (and the district courts that have followed it) thus

---

[4] Central to the Eighth Circuit's ruling, moreover, were two factual assumptions regarding the relationship between covered entities and contract pharmacies: first, that "[c]overed entities maintain legal title to the 340B drugs" when they are acquired by contract pharmacies, 95 F.4th at 1142; *see id.* at 1144; and second, that a contract pharmacy acts as "an agent of the covered entity" with respect to the sale of 340B drugs, *id.* at 1142. Those factual assumptions were foundational to the court's conclusion that, under the

failed to consider whether the law has any genuine effect on drug distribution or draws any distinction between 340B drugs and other drugs besides the price at which the drugs are sold.

The only court to have meaningfully considered that question correctly determined that an analogous West Virginia law "regulates price, not delivery." *PhRMA v. Morrisey*, No. 2:24-cv-271, 2024 WL 5147643, at *8 (S.D.W. Va. Dec. 17, 2024). Under the "replenishment model," that court explained:

> Because the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about delivery of the drug. The question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one.

*Id.* Or "[p]ut another way, the system is about delivery *at a given price*, not delivery *per se*." *Id.*

The same is true of Act 358. Since the contract pharmacy already has possession of and title to the drug before the patient arrives at the pharmacy, the only question is the price at which the replenishment sale will occur. And the only fact relevant to determining whether the replenishment sale complied

---

Arkansas law, "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts." *Id.* at 1144. But AstraZeneca has challenged those (false) premises here, ROA.26–29, ROA.1083–84, and its factual allegations must be taken as true for purposes of summary judgment.

with the Act is if it took place at market prices (violation) or 340B prices (no violation). Simply put, a law that forbids a drug manufacturer from charging the wrong price is a law that regulates drug pricing.

### C.    Act 358 Is Preempted by Section 340B

A state law is preempted by federal law if the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citation omitted). Such interference occurs where a state law "dramatically increase[s] the burdens facing" participants in a federal scheme in ways "not contemplated by Congress." *Buckman*, 531 U.S. at 350. That is the case here: In enacting Section 340B, Congress carefully balanced the benefits and burdens of participation in the 340B Program, so that manufacturers would know exactly which obligations they were taking on when they agreed to participate. Act 358 recalibrates the "burden" side of the scale, upending Congress's careful calculus.

By extending 340B-discounted pricing to unlimited contract pharmacy sales, Act 358 drastically increases manufacturers' costs of participating in the 340B program. As the Third and D.C. Circuits have held—and Defendants do not contest—Section 340B itself does *not* obligate manufacturers to make

discounts available for unlimited contract pharmacy sales. *See Sanofi*, 58 F.4th at 703–04; *Novartis Pharms.*, 102 F.4th at 464. Instead, prior to Act 358's enactment, AstraZeneca and other manufacturers were authorized to adopt policies limiting access to 340B discounts to sales made directly to a covered entity or through a single contract pharmacy; covered entities were entitled to use 340B discounts to "turn a profit" only on those sales. *Sanofi*, 58 F.4th at 699.

Now, however, Act 358 requires manufacturers to also make 340B discounts available for an *additional* category of transactions: unlimited contract pharmacy sales. Doing so enables covered entities and their associated contract pharmacies to "squeeze [more] revenue out of" the program. *Id.* at 704. But it imposes a corresponding burden on manufacturers. The additional "revenue" captured by covered entities (and contract pharmacies) comes directly out of the pockets of manufacturers, *see* ROA.305, 323, 424, 466, dramatically changing manufacturers' costs of participating in the federal program.

In effect, Louisiana has used manufacturers' participation in the federal 340B program as leverage to extract additional money from them under state law. The result is to "exert an extraneous pull on the scheme established by Congress," thus "skew[ing]" the "delicate balance of statutory objectives."

*Buckman*, 531 U.S. at 348, 353. Accordingly, even if the State and Intervenor were correct that Act 358 somehow regulates only delivery—though they are not, *see supra* Section I.B—that *still* would not save it from preemption: Imposing a costly new delivery obligation on transactions under a federal program just as readily "discourage[s]" participation in the program. *Buckman*, 531 U.S. at 351.

For their part, the State and Intervenor do not dispute that Act 358 gives covered entities a valuable financial "benefit"—which they sometimes euphemistically refer to as "savings," "revenue," or "program income." *See* ROA.305, 323, 424, 466. Nor could they dispute it: The very reason for enacting the Act was Louisiana's view that "[t]he restrictions imposed by AstraZeneca and the other manufacturers ha[d] deprived covered entities of the revenue and healthcare savings that Congress intended by enacting the 340B program," and the State viewed the legislation as necessary to reinstate those "revenue[s] and healthcare savings." ROA.305; *accord* ROA.323–24.

It is similarly undisputed that such money comes directly *from manufacturers* who participate in the 340B program. *See* ROA.305, 323, 424, 466. A state law that requires an entity to provide millions of dollars in forced discounts annually if, but *only* if, the entity chooses to participate in a federal

program thereby "skew[s]" the program's "delicate balance of statutory objectives," *Buckman*, 531 U.S. at 348—regardless of whether those state-law obligations are (mis)characterized as obligations with respect to "delivery."

Act 358's disruptive effect on federal priorities is especially strong because, if Louisiana may add to the burdens of participating in a federal benefits program, then so may any other State. Indeed, a growing list of States—including Arkansas, Maryland, Mississippi, West Virginia, Kansas, Minnesota, and Missouri—have passed laws that similarly seek to extract state-law benefits from the 340B program. A manufacturer deciding whether to participate in the 340B program (and in Medicare and Medicaid, with which it is intertwined) would have to consider, not merely what participation would cost under the federal programs themselves, but also under each associated state law. If States could impose costly state-law burdens targeted solely at those who participate in voluntary federal benefits programs, it would leave Congress with "less to offer and less economic . . . leverage as a consequence." *Crosby*, 530 U.S. at 377. Such a "state Act" that expressly targets federal program participants, and saddles them with new obligations, is preempted because it "reduces the value of the [bargaining] chips created by the federal statute." *Id.*

The district court's contrary reasoning is unpersuasive. The court asserted that, "because Section 340B does [not] address contract pharmacies," Act 358 "do[es] not create 'an unacceptable obstacle to the accomplishment and execution' of Congress'[s] objectives." ROA.988 (quoting *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013)). But that argument turns preemption principles on their head: The fact that Act 358 mandates costly discounts for a category of transactions (unlimited contract pharmacy sales) that *are not* addressed in Section 340B itself is precisely *why* the Act imposes additional burdens on participation in the federal program. Those state-imposed burdens go substantially beyond what Congress had in mind when it balanced the costs and benefits of program participation.

The district court further stated that Act 358 "arguably *advances* Congress'[s] objectives with respect to the Section 340B program" in two ways: by "allowing covered entities . . . [to] increase their revenues from insured patients who use those pharmacies," and by "arguably provid[ing] wider coverage for patients of covered entities." ROA.988. But even if Congress intended for Section 340B to benefit covered entities and improve patient access, and

even if Act 358 actually facilitated those goals,[5] Congress certainly did not intend to pursue those objectives *at all costs*. *See Hernandez v. Mesa*, 589 U.S. 93, 100 (2020) ("No law pursues its purposes at all costs.") (cleaned up). Congress did not design the 340B program so that covered entities could "maximize their 340B profits." *Sanofi*, 58 F.4th at 704. Instead, Congress calibrated Section 340B in order to balance the program's costs against its benefits; Act 358 upsets that careful balance, and thus stands as an obstacle to federal law.

## II.    Act 358 Violates the Contracts Clause

Article I, Section 10 of the Constitution prohibits States from enacting laws that "impair[] the Obligations of Contracts." To determine whether a

---

[5] This contention is based on a factual premise that was expressly disputed below. The State asserted that Act 358 was enacted to address "[t]he strain on Louisiana's Covered Entities and the distance of many Louisiana patients from covered healthcare providers." ROA.342. But the State did not supply any evidence to support that assertion. Likewise, Intervenor argued that "[r]estrictions on contract pharmacies systematically deprive significant numbers of vulnerable patients adequate access to lifesaving healthcare services." ROA.389. But its sole evidence was an affidavit from the CEO of a single covered entity, and AstraZeneca was not permitted to take discovery to probe the factual basis for Intervenor's assertions, despite requesting it. *See* ROA.623–33. In any event, under its policy, AstraZeneca continues to make its products available at 340B-discounted prices—in unlimited quantities—to all covered entities, and nothing in AstraZeneca's policy prevents covered entities from passing on those discounts to their patients. *See* ROA.29, 172. The district court's speculation that Act 358 "arguably provides wider coverage" thus cannot be credited.

state law violates the Contracts Clause, courts evaluate three factors: first, whether the law "has, in fact, operated as a substantial impairment of the contractual relationship," *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978); second, whether the State's asserted justification for the law serves "a significant and legitimate public purpose" *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 627 (5th Cir. 2010); and third, whether the law was "reasonably necessary" to achieve that purpose, *id.* (citation omitted).

AstraZeneca has properly alleged that Act 358 satisfies all elements of a Contracts Clause claim. As explained above, the 340B Program requires manufacturers to enter into contracts, called pharmaceutical pricing agreements (PPAs), with the federal government. *See* 42 U.S.C. § 256b(a)(1). Act 358 substantially impairs AstraZeneca's PPA, by imposing costly new obligations on it *only* as a result of entering into that contract. And the Act is not drawn in a reasonably necessary way to advance the State's asserted interest in protecting its citizens' access to prescription drugs, because the law in fact does not promote patient access.

The district court granted summary judgment on AstraZeneca's Contracts Clause claim, but the State and Intervenor failed to demonstrate based on the pleadings alone—much less through actual evidence—that Act 358 does

36

not substantially impair AstraZeneca's PPA; that the law serves a significant and legitimate public purpose; or that it achieves such a purpose in an appropriately direct or reasonably necessary manner. Thus, none of the three prongs of AstraZeneca's Contracts Clause claim could be resolved in Defendants' favor on summary judgment prior to factual development. Indeed, Contracts Clause claims do not solely present legal questions and are rarely, if ever, decided without discovery or a factual record.[6]

The district court therefore should have denied summary judgment, to afford the parties an opportunity to develop the record. But even if AstraZeneca's Contracts Clause claim were suitable for resolution on summary judgment prior to any discovery or other factual development, the court should have granted judgment *for AstraZeneca*: Act 358 substantially impairs

---

[6] *See, e.g.*, *Powers v. United* States, 783 F.3d 570, 578 (5th Cir. 2015) ("The district court easily concluded that there was no evidence in the record that Powers had any existing contracts to perform or coordinate details when the ordinances were enacted."); *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 631 (5th Cir. 2010) ("[T]he record indisputably demonstrates that the Act is narrowly focused on benefitting in-state HMOs (indeed, a specific one) and is not a broad exercise of the State's police power."); *Jones v. Bd. of Supervisors of Univ. of La. Sys.*, 58 F. Supp. 3d 670, 675–76 (W.D. La. 2014) (evaluating Contracts Clause claim based on extensive sets of exhibits proffered with cross-motions for summary judgment).

AstraZeneca's PPA, and Defendants failed to carry their burden of showing that the law serves a significant and legitimate public purpose.

## A.    Act 358 Impairs AstraZeneca's PPA

In determining "whether [a] state law has operated as a substantial impairment of a contractual relationship," courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 584 U.S. 811, 811–12 (2018) (citation omitted). Act 358 does precisely that.

The 340B Program requires manufacturers like AstraZeneca to enter into PPAs with the federal government. *See* 42 U.S.C. § 256b(a)(1); *see also* ROA.167. AstraZeneca signed its PPA with the expectation that it would be required to provide 340B discounts *only* for a limited category of transactions directly involving covered entities themselves, and it entered the PPA in reliance on that expectation. As the D.C. Circuit recently underscored (echoing the Third Circuit), neither the 340B statute nor the PPA (which incorporates the statute's requirements) obliges AstraZeneca to make 340B discounts available for sales "to an unlimited number of contract pharmacies." *Novartis Pharms.*, 102 F.4th at 461 (quoting *Sanofi*, 58 F.4th at 703). Act 358 thus seeks

to expand AstraZeneca's obligations for participating in the 340B Program, by requiring AstraZeneca to "deliver" 340B-discounted drugs (*i.e.*, to provide 340B discounts) for a *different* category of transactions (unlimited contract pharmacy sales) that are not required by AstraZeneca's PPA.

The district court nevertheless held that Act 358 does not impair Astra-Zeneca's PPA because it "does not change or expand which entities qualify as 'covered entities.'" ROA.994. But regardless of whether the Act changes which *entities* qualify for discounts,[7] it undeniably expands the category of *sales* that qualify: Prior to Act 358, manufacturers were not obligated to provide discounts for unlimited contract pharmacy sales; following the Act's enactment, they are obligated to do so. The Act accordingly "undermines the contractual bargain" into which AstraZeneca entered when it signed its PPA. *Sveen*, 584 U.S. at 819.

The district court also reasoned that AstraZeneca's PPA was not impaired because "Act 358 only affects the *delivery* or *acquisition* of Section

---

[7] The district court's factual premise that Act 358 does not affect which entities can access 340B discounts is incorrect. As noted above, publicly available documents indicate that contract pharmacies *do not* act as agents for covered entities and that contract pharmacies in fact take title of 340B drugs—both of which undercut the premise that contract pharmacies act only on behalf of the covered entity. *See* p. 8, *supra* (citing Walgreens contract).

340B drugs," rather than their prices. ROA.994. As discussed above, that argument is wrong. *See* Section I.B, *supra*. But even if this Court agrees with the semantic argument that Act 358 merely requires manufacturers to "deliver" 340B-discounted drugs to contract pharmacies, the result is the same: It is undisputed that the Act imposes *under Louisiana law* a new obligation that did not exist—and does not exist—*under the PPA*. The law's effect is thus to bootstrap, onto AstraZeneca's contractual agreement with the federal government, new and uncontracted-for financial burdens.

Moreover, the implications of those expanded burdens are undeniable. Indeed, in the district court, Intervenor itself asserted that Act 358 is aimed at "generat[ing] revenue for covered entities" from contract pharmacy sales, including by enabling them to retain "the difference between the insurer's payment" for the full cost of an insured patient's drugs "and the [340B] discounted price." ROA.370. This differential "is income to the covered entity." ROA.370; *see* ROA.398 (Act 358 targets limitations on contract pharmacy sales that "deprive[] covered entities" of "revenue and savings"); ROA.305 (similar); ROA.323 (similar). Regardless of whether these sums are described as "revenue," "income," or a "savings," they come directly from manufacturers like AstraZeneca, who are forced by Act 358 to bear this new financial burden as a

40

consequence of having signed its PPA. That amounts to a significant impairment of the contractual relationship.

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978), is instructive. There, the Supreme Court held that the Contracts Clause prohibited Minnesota from requiring a company, after it had agreed to provide pension benefits under specified contractual conditions, to provide additional benefits not specified in the contract. *Id.* at 245–51. The problem with that law was that it "change[d] the company's obligations"—imposing new obligations beyond what it had already agreed to—thereby "disrupti[ng] [its] contractual expectations" by "impos[ing] a completely unexpected liability in potentially disabling amounts." *Id.* at 246–47. The Court also noted that the Minnesota law "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State." *Id.* at 250.

Act 358 alters AstraZeneca's expectations under the PPA in the same way. It forces AstraZeneca to provide 340B discounts for a significant category of transactions (unlimited contract pharmacy sales) that are *not* included within the program in which AstraZeneca agreed to participate. The obligations imposed by the Act, like the statutory enactments struck down in *Allied*

*Structural Steel*, were "imposed" by Louisiana only *after* AstraZeneca had signed its contract with HHS, and they operate in "an area never before subject to regulation by the State." *Id.*

The district court dismissed *Allied Structural Steel* because, in its view, "the Minnesota law in that case effectively changed the terms of the contract," whereas "[h]ere, the terms of the PPA remain unchanged." ROA.994. But that response begs the question (assumes its own conclusion). It also ignores that Act 358 *does* change the terms of AstraZeneca's PPA, by imposing new obligations that go substantially beyond what AstraZeneca agreed to. If a seller enters into a contract agreeing to offer its product within identified parameters ("I agree to provide discounts on Tuesdays"), and then the State passes a law requiring anyone who signs such a contract to offer its product *outside* those parameters ("Because you provide discounts on Tuesdays, you must also deliver discounted products on Mondays and Wednesdays"), then the State has materially impaired the parties' bargained-for agreement.

The district court was also wrong to conclude that AstraZeneca should have "reasonably expect[ed]" that Louisiana would enact a regulation like Act 358. ROA.996. The 340B program had existed for decades (since 1992) without *any* efforts by States to regulate 340B sales (or "distribution").

Indeed, the very first state law entering this field was enacted by Arkansas *in 2021*—long after AstraZeneca signed its PPA. *See Allied Structural Steel*, 438 U.S. at 250 ("[The challenged state law] did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State."). And AstraZeneca entered into its PPA with the reasonable expectation, consistent with federal law, that it would *not* be required to make 340B discounts available for unlimited contract pharmacy sales. There is simply no factual basis—nor have Defendants attempted to supply any—to support the notion that AstraZeneca should have anticipated Act 358 when it signed its PPA over thirty years ago.

The district court also put great weight on the fact that "[t]he terms of a PPA effectively mirror [Section 340B]." ROA.994. But that fact undermines, rather than supports, the court's conclusion: Per the Third and D.C. Circuits, Section 340B *does not* obligate manufacturers to make discounts available for sales "to an unlimited number of contract pharmacies." *Novartis Pharms.*, 102 F.4th at 461 (quoting *Sanofi*, 58 F.4th at 703). So if AstraZeneca's PPA effectively mirrors its obligations under Section 340B, then the PPA similarly contains no obligation of the sort that Act 358 now imposes.

Nor is there any authority for the bizarre proposition that contracts *backed by federal law* should somehow get lesser protection under the Contracts Clause. When manufacturers like AstraZeneca chose to participate in the 340B program, they did so based on their reasonable expectations about what their obligations would be under the PPA. The Contracts Clause was adopted to provide confidence that no subsequent state law will impair such a contract. That the PPA tracks federal law only serves to *reinforce* AstraZeneca's reasonable expectation that the PPA reflected the full extent of its obligations for participation in the 340B program. In enacting Act 358, Louisiana has imposed new, burdensome state-law obligations on manufacturers, fundamentally altering the bargain they struck with the federal government years earlier.

### B.  Defendants Have Not Demonstrated that Act 358 Is Reasonably Tailored to Serve a Significant and Legitimate Public Purpose

Act 358's impairment of AstraZeneca's PPA does not serve "a significant and legitimate public purpose." *United Healthcare*, 602 F.3d at 627. Louisiana has *never* articulated a clear public purpose or interest supporting the Act— as evident from the vague references to "broad and general social or economic problem[s]" or "vital interests" of the people. ROA.995 (citations omitted).

Indeed, the district court merely speculated that "[t]he state *could credibly argue* that Act 358 promotes greater access to discounted drugs." ROA.995 (emphasis added). But such speculation about what the State "could credibly argue" falls far short of demonstrating that Act 358 in fact serves a significant and legitimate purpose. At most, the utter lack of evidentiary support for the court's speculation means that "[f]actual questions exist, . . . making summary judgment inappropriate." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 483 (1992).

Even accepting the district court's speculation that Act 358 was designed to "promote[] greater access to discounted drugs," ROA.995, the record does not support that the Act is "reasonably necessary" to achieve that goal. *United Healthcare*, 602 F.3d at 627. For one thing, the Act cannot be justified as necessary to promote patient access, because AstraZeneca's policy ensures that *every* covered entity is offered 340B drugs at 340B-discounted prices. ROA.172. Indeed, its policy goes further, allowing a covered entity to designate a contract pharmacy if it lacks an on-site pharmacy. ROA.172. AstraZeneca also provides millions of dollars for patient assistance programs, to ensure that every patient can obtain needed medications at prices they can afford.

For another thing, Act 358 does not affect patient access or (in the great majority of cases) patient pricing: From a patient's perspective, it makes no difference whether a prescription is filled by a contract pharmacy, since "[s]tudies show that most 340B discounts to contract pharmacies are *not* passed on to patients, who must pay full price for their drugs." ROA.40; *see* ROA.27, 145. As a report from the HHS Inspector General explained, many contract pharmacies offer *no* 340B patient discounts, such that even "uninsured patients pay the full non-340B price for their prescription drugs at contract pharmacies." ROA.27 (quoting HHS-OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 2 (Feb. 4, 2014), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf). Nor does Louisiana have any legitimate interest in "advanc[ing] the economic interests" of covered entities and pharmacies "at the expense of companies like AstraZeneca." ROA.40. It is well settled that the Contracts Clause "prohibits special-interest redistributive laws, even if the legislation might have a conceivable or incidental public purpose" *Assn. of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 732 (8th Cir. 2019); *accord Apartment Ass'n of Los Angeles, Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 912 (9th Cir. 2021) ("[H]istorical context suggests that the Clause was aimed at all retrospective,

redistributive schemes in violation of vested contractual rights.") (citation omitted).

In response, Defendants have provided *no* evidence that Act 358 is reasonably necessary to promote, and in fact does promote, increased patient access. Instead, they have argued that courts must "defer to [the State's] legislative judgment as to the necessity and reasonableness" of its law. ROA.342 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987)); *see* ROA.389. But where such deference has been found appropriate, the State actually "set forth rather detailed findings about the dangers" that its law was meant to address "and the need for legislation" to combat them. *Keystone*, 480 U.S. at 486 n.14. It is one thing to defer to express legislative findings about the need for a particular state law; it is quite another to rely on justifications articulated in litigation by counsel—especially when those justifications are contradicted by actual evidence offered by the other side. Defendants' attempted reliance on unsubstantiated assertions made in legal briefs, rather than on evidence or even legislative findings, further underscores that summary judgment should not have been granted. *See* Fed. R. Civ. P. 56(d); ROA.633.

## CONCLUSION

The Court should reverse the decision below.


Dated: January 9, 2024

Respectfully submitted,

/s/ *Allon Kedem*

Allon Kedem
Jeffrey L. Handwerker
Stephen K. Wirth
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for AstraZeneca*
*Pharmaceuticals L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2025, the foregoing document was electronically filed with the Court via the appellate CM/ECF system, and that copies were served on counsel of record by operation of the CM/ECF system on the same date.

Dated: January 9, 2025

/s/ *Allon Kedem*
Allon Kedem

*Counsel for Appellant AstraZeneca Pharmaceuticals L.P.*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 9,991 words excluding the parts exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2. This document complies with the typeface and type style requirements of Fifth Circuit Rule 32.1 and Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because it has been prepared in a proportionately spaced typeface using Microsoft Word in Century Expanded BT 14-point font.

Dated: January 9, 2025                    */s/ Allon Kedem*
                                          Allon Kedem

                                          *Counsel for Appellant AstraZeneca*
                                          *Pharmaceuticals L.P.*